(Page 2 of 13 - This print header can be changed using the printHeader HTML tag - see the viewONE HTML manual for further information)

Case 1:18-cv-00471-GLR   Document 2   Filed 02/15/18   Page 1 of 11

# IN THE CIRCUIT COURT FOR HARFORD COUNTY, MARYLAND

**PRESCOTT LOVERN, SR.**
15 E. Churchville Rd., STE 150
Bel Air, MD 21014
(941)-870-8072

PLAINTIFF,

Case No. 12-C-17-2518

v.

**CITIBANK N.A.**
701 East 60th St N.
Sioux Falls, SD 57104
(605)-331-2626

```
Case# 12-C-17-002518
CF-Civil Fili
                    $60.00
AIF-New Case
                    $50.00
HL80
                    $55.00
TOTAL       $165.00

Receipt #2017000007310
Cashier: XD_CDIMDR1
03/25/17  12:18pm
```

**MASTERCARD INCORPORATED**
2000 Purchase Street
Purchase, NY 10577
(914)-249-2000

DEFENDANT.

# COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

## I. INTRODUCTION

1.     "Who pays the Interchange Fee" on all MasterCard credit cards is the theme of
this action brought by Prescott Lovern, Sr. (Plaintiff) who respectfully requests that this
Honorable Court grant his request for declaratory judgment pursuant to TITLE 3 - Subtitle 4
Section 3-401 et seq. Plaintiff requests that this Court declare, adjudge and decree that domestic
MasterCard (MC) credit card cardholders (collectively hereinafter "MC Cardholders")
pay what is known as the "Interchange Fee" (IF) on every MasterCard credit card transaction in



(Page 3 of 13 - This print header can be changed using the printHeader HTML tag - see the viewONE HTML manual for further information)

Case 1:18-cv-00471-GLR   Document 2   Filed 02/15/18   Page 2 of 11

the State of Maryland. Plaintiff is the Master of this complaint and he files a single-count

complaint seeking only a declaratory judgment.

## II. JURISDICTION & VENUE

2.      Jurisdiction is appropriate in this Court pursuant to TITLE 3 - COURTS OF GENERAL

JURISDICTION - JURISDICTION/SPECIAL CAUSES OF ACTION, Subtitle 4 - §3-403;

§1–501; §6-103 of the Courts and Judicial Proceedings Article of the Maryland Code; and,

the Maryland Court of Appeals conspiracy theory of jurisdiction.

3.      Venue is appropriate in this Court pursuant to Section 6-201(a) of the Courts and Judicial

Proceedings Article of the Maryland Code.

## III. PARTIES

4.      PRESCOTT LOVERN, SR. [Plaintiff] is over 18, a U.S. Citizen, and a resident of

Harford County. Plaintiff is part of the M Cardholder group as he has taken an assignment of

legal claims from Jane Doe (Doe) pursuant to *Sprint Communications Co. LP v. APCC Services

Inc.*, 554 U.S. 269, (2008). Plaintiff's rights in question fall under MD Commercial Law - §13–

301, Unfair or deceptive trade practices include any:

> (1)  False, falsely disparaging, or misleading oral or written statement, visual description,
> or other representation of any kind which has the capacity, tendency, or effect of
> deceiving or misleading consumers.

5.      Defendant CITIBANK N.A. (Citi) is headquartered in Souix Falls, S.D. Citi does

business in the County as Doe lives in the County and has a Citi MasterCard (CMC). Every retail

business in the County who accepts MasterCard accepts the CMC.

6.      MASTERCARD INCORPORATED (MCI) is a Delaware corporation headquartered in

Purchase, NY. MCI does business throughout the County with every retail business who accepts

2

(Page 4 of 13 - This print header can be changed using the printHeader HTML tag - see the viewONE HTML manual for further information)

Case 1:18-cv-00471-GLR   Document 2   Filed 02/15/18   Page 3 of 11

the MasterCard credit and debit card. It is Plaintiff's position that every time a CMC credit

card is used in the County the cardholder pays the IF. MCI establishes and sets the IF for all

MasterCard credit cards.

## IV. FACTUAL ALLEGATIONS

7.    **INTERCHANGE FEE**

Around 1970, National Bankamericard, Inc. (NBI) was organized [with Dee Hock as

President] to coordinate the development and expansion of Bankamericard through licensee

banks across the United States. Bank of America, which had originated the Bankamericard

concept, agreed to allow NBI to function as an organization to be owned by all of the licensee

banks.

8.    When Mr. Hock created the interchange fee (IF) back in the late 60s, it was decided by

NBI / BOA management that the IF would be a vehicle to entice BOA's competitors to issue

BOA's Bankamericard. By giving 100% of the IF to the issuing bank this created a substantial

source of revenue for the issuing bank, and an excellent incentive to join the Association that

allowed issuance.

9.    BOA executives and Hock were concerned about the consumers' willingness to use the

Bankamericard (BCC) if they knew they were paying a surcharge every time they used the card,

so, it was decided by Hock and BOA executives to create a "scheme."

10.    The *scheme* was to hide the IF from BCC credit card cardholders so they would not know

they were paying a service charge every time used the BCC. When Mastercharge was

created it incorporated the same scheme, and today every MasterCard credit card hides the IF

from the cardholder so they do not know they pay the IF.

3

(Page 5 of 13 - This print header can be changed using the printHeader HTML tag - see the viewONE HTML manual for further information)

Case 1:18-cv-00471-GLR   Document 2   Filed 02/15/18   Page 4 of 11

## THE INTERCHANGE FEE SHELL GAME

11.    For almost 44 years the Defendants tried to claim the Merchants, who accept MC &

VISA credit cards (collectively hereinafter "CREDIT CARDs"), pay the IF, until the Merchants

sued them in IN RE PAYMENT CARD INTERCHANGE FEE and DISCOUNT ANTI-TRUST

LITIGATION – MASTER FILE NO. 1:05-md-1720- JG JO, United States District Court,

Eastern District of New York. [case settled for about $7.25 Billion, [vacated]. WFC denied that

the Merchants pay the IF.

Page 10, Para. 10 -  FIRST CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

> 10. Most of the retailer-owners and retailer-members of AFMW accept payment
> by <u>Visa and/or Mastercard Credit Cards</u> and Debit Cards and, as such, are <u>forced to pay</u>
> <u>the supracompetitive Interchange- and Merchant-Discount Fees associated with these</u>
> <u>Transactions and are forced to abide by Anti-Steering Restraints and tying and bundling</u>
> <u>arrangements imposed by Defendants</u>. AFMW's retail members and owners that accept
> Visa and/or Mastercard Credit Cards and Debit Cards have been injured in their business
> or property and many have agreed or will agree to assign their claims for monetary
> damages to AFMW. [underline added for emphasis] Case 1:05-md-01720-MKB-JO
> Document 317, Filed 04/24/06 Page 10 of 98, PageID #: 2293

> **WELLS FARGO & CO**. – Answer to first consolidated amended complaint, *page 3*
> *paragraph 10*. "Denied."
> *Wells Fargo* denied merchants pay the interchange fee. Case 1:05-md-01720-MKB-JO
> Document 378, Filed 06/09/06, para. 10 - Page 3 of 33, PageID #: 3034

The Complaint says "Visa and/or Mastercard **Credit Cards**." Wells Fargo denies the Merchant

pays the "supracompetitive <u>Interchange</u>- and Merchant-Discount <u>Fees.</u> [underline added]

> **WACHOVIA CORPORATION & WACHOVIA BANK N.A.** - Answer to first
> consolidated amended complaint, *page 2 – paragraph 10*. "Wachovia lacks
> knowledge or information sufficient to form a belief as to the truth of whether
> most retailer-owners and retailer-members of AFMW accept payment cards.
> <u>Wachovia denies the remaining allegations asserted in paragraph 10.</u>"
> *Wachovia* [a.k.a. Wells Fargo], same question, same case, again denies merchants
> pay the interchange fee. Case 1:05-md-01720-MKB-JO Document 406, Filed 06/09/06,
> Page 2 of 38, para. 10, PageID #: 3918

(Page 6 of 13 - This print header can be changed using the printHeader HTML tag - see the viewONE HTML manual for further information)

Case 1:18-cv-00471-GLR   Document 2   Filed 02/15/18   Page 5 of 11

12.     There are three sets of fees in every CREDIT CARD transaction, all separate and distinct, all paid to three different parties.

   1) Processing Fees - [Discount Fees] – paid by the Merchant to the Acquiring Bank.

   2) Network Fees – paid by the Merchant to VISA and/or Mastercard for use of their Network [transmission costs] paid through the Acquiring Bank.

   3) Interchange Fee – Paid by the CREDIT CARD Cardholder, kept by the CREDIT CARD Issuing Bank.

13.     The way IF collection was originally designed [default system still being used today], in a CREDIT CARD transaction there is no financial transaction at the point of sale, only a collection of data. The merchant collects the cardholder's personal data by swiping the card, or accessing its chip, then the cardholder signs a receipt, which simply promises the merchant the cardholder's bank will pay for the transaction [the merchant has already received approval through the VISA or MasterCard Network for the transaction]. The merchant then transmits the transaction data to the Acquiring Bank, who transmits the data to the respective Network, who transmits the data to the Issuing Bank, who debits the Cardholder's Account [credit line – total transaction amount], **and then** the issuing bank immediately; A) deducts the IF right off the top and keeps it. The balance is remitted to the Network who; B) deducts their "network fee;" they remit the remaining balance to the Acquiring Bank who then; C) deducts the processing fees. Merchant gets the remaining balance. Collectively A, B, & C are known as the "Discount Fees." A & B together are known as "**Interchange Rate**" ["Rate," not "Interchange Fee" – the Interchange Rate includes the IF. The IF does not include any other charge, only the IF]. The IF is between the CREDIT CARD Cardholder (CCCH) and the issuing bank only. There is a Contract between the CCCH and the issuing bank, whereas there is NO Contract between the

5

(Page 7 of 13 - This print header can be changed using the printHeader HTML tag - see the viewONE HTML manual for further information)

Case 1:18-cv-00471-GLR   Document 2   Filed 02/15/18   Page 6 of 11

Acquiring Bank and the Issuing Bank in the default system, unless they are one in the same.

14.     Now for the big question, is there really a Conspiracy? Judge Gleeson appears to think

Mastercard & Visa are engaged in a Conspiracy. In his 2003 decision in the VISA / MasterCard

antitrust case about *honor all cards*, initiated by merchants [Walmart] where he says about

whether it's possible to believe MasterCard and VISA are engaged in a conspiracy with each

other –

> "In addition to their claims of substantive tying violations of § 1, the
> merchants claim that Visa and MasterCard acted in concert to impose
> those illegal tying arrangements on them. The defendants contend that
> the merchants have failed to present any "direct or circumstantial evidence
> that reasonably tends to prove that [they] had a conscious commitment to a
> common scheme designed to achieve an unlawful objective." *Monsanto Co.
> v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (quotations and
> citations omitted). **I disagree**. There is evidence, direct and circumstantial,
> from which a jury could find a conspiracy." [bold print and underline added
> for emphasis]. UNITED STATES DISTRICT COURT FOR ONLINE PUBLICATION
> ONLY EASTERN DISTRICT OF NEW YORK - IN RE VISA
> CHECK/MASTERMONEY MEMORANDUM ANTITRUST LITIGATION AND
> ORDER 96-CV-5238 (JG) JOHN GLEESON, United States District Judge, Pg. 10 of 15

15.     In the default settlement system controlled by Mastercard & Visa the acquiring bank does

not have a contract with the issuing bank that authorizes the issuing bank to deduct the IF. In

*U.S. and Plaintiff States v. American Express Co., et al.*, Eastern District New York [antitrust

case] Mastercard, Inc. and Visa, Inc. settled with the government[s] and stipulated in the

settlement agreement, Case 1:10-cv-04496-NGG -RER Document 142, Filed 07/20/11, **II.**

**Definitions**, No. 1 -

> **Stipulation** – " 'Acquiring Bank' means a Person authorized by MasterCard or Visa to
> enter into agreements with Merchants to accept MasterCard's or Visa's General Purpose
> Cards as payment for goods or services." [underline added]

It does not say acquiring banks can enter into contracts with the issuing banks. The default

system was not, and is not, designed that way. The acquiring bank has a contract with the

6

(Page 8 of 13 - This print header can be changed using the printHeader HTML tag - see the viewONE HTML manual for further information)

Case 1:18-cv-00471-GLR   Document 2   Filed 02/15/18   Page 7 of 11

merchant to process the CREDIT CARD transaction for a fee, not pay the IF.

16.     The IF has always been paid by the CREDIT CARD Cardholder, proven by IFs reflected

on <u>CREDIT CARD issuing banks **financial statements**</u>, physical evidence, all corroborated by

investigations by the House Antitrust Task Force et al;

> "<u>Consumers Pay for Interchange</u> - All consumers shoulder the burden of
> interchange fees as the costs are passed along in the form of higher prices
> for goods and services. In fact, the average household paid more than
> $300 in hidden interchange fees in 2006." (The Merchants Payments
> Coalition, September 14, 2007 – *Prepared for the House Judiciary*
> *Committee Antitrust Task Force In Response to Questions Raised by*
> *Congressman Ric Keller at the July 19, 2007 hearing of the Antitrust*
> *Task Force, entitled, "Credit Card Interchange Fees", Pg. 12).*

Corroborated in GAO's Report to Congress in 2006;

> "After the transaction is approved, the issuing bank will send the
> purchase amount, <u>less an interchange fee,</u> to the merchant's bank.
> The interchange fee is established by the card association."
> [underline added for emphasis] *Pg. 73, United States Government*
> *Accountability Office Report to the Ranking Minority Member,*
> *Permanent Subcommittee on Investigations, Committee on*
> *Homeland Security and Governmental Affairs, U.S. Senate,*
> *September 2006 - credit cards Increased Complexity in*
> *Rates and Fees Heightens Need for More Effective Disclosures*
> *to Consumers.*

From the Federal Reserve:

> "The network routes information first to authorize then to settle the payment.
> To settle, the card issuing bank obtains funds from the cardholder - $100 in
> this example – with which it can pay the merchant bank. <u>However, the card-issuing</u>
> <u>bank retains a portion of the funds as an interchange fee.</u> In this example, the fee is
> $1.50 and the card-issuing bank sends $98.50 to the merchant bank." [underline added for
> emphasis] *Pg. 92, Interchange Fees in Credit and Debit Card Markets: What Role For*
> *Public Authorities?  A summary of a Federal Reserve Bank of Kansas City Conference.*
> *By Barbara Pacheco and Richard Sullivan – 2005;*

(Page 9 of 13 - This print header can be changed using the printHeader HTML tag - see the viewONE HTML manual for further information)

Case 1:18-cv-00471-GLR   Document 2   Filed 02/15/18   Page 8 of 11

From the FDIC:

> "Finally, figure 3 provides a basic illustration of the most complex model,
> the model with one card association, many cardholders, many merchants,
> and multiple banks. In this model, the card association (or network) plays
> an important role by imposing rules for issuing cards, clearing and settling
> transactions, advertising and promoting the brand, authorizing
> transactions, assessing fees, and allocating revenues among transaction
> participants. Further, each participant in the credit card transaction has an
> incentive for participating in the network. Figure 3 shows the typical flow
> of information and funds for a sample $100 credit card purchase. The
> process begins when the cardholder presents the credit card to the
> merchant to purchase a good or service. The merchant transmits to the
> acquiring bank the cardholder's account number and the amount of the
> transaction. The acquiring bank forwards this information to the card
> association network requesting authorization for the transaction. The
> card association forwards the authorization request to the issuing
> bank. The issuing bank responds with its authorization or denial through
> the network to the acquiring bank and then to the merchant. <u>If approved,
> the issuing bank also sends to the acquiring bank, via the network, the
> transaction amount less an interchange fee.</u>  **The interchange fee is
> established by the card association**. The example illustrated in figure 3
> shows $98.00 ($100.00 purchase price minus 200 basis point interchange
> fee) flowing from the issuing bank, though the network, to the acquiring
> bank. The acquiring bank, after subtracting its own service fee, passes the
> payment on to the merchant. In figure 3, the merchant receives $97.50
> ($98.00 minus a 50 basis point fee)." [underline and bold print added for emphasis]
> *Pg. 27, 28, FDIC Banking Review – Overview of Recent Developments in the
> credit card Industry by Douglas Akers, Jay Golter, Brian Lamm,
> and Martha Solt – 2005;* [underline bold print added for emphasis].

Another reason the CCCH has to pay the IF is so the issuing bank can use the IF to pay Affinity

Partners a percentage of gross sales for putting their name on the CREDIT CARD.

FDIC 2007 –

> Co-branded relationships are partnerships formed between financial institutions and
> unaffiliated organizations, generally for-profit organizations such as airlines, automobile
> manufactures, and retailers. Similar to the affinity program, a contractual agreement
> governs the co-branded relationship, and the co-branded card usually carries the co-
> branded partner's logo. <u>Compensation to the co-branding partner often takes the form of</u>

8

(Page 10 of 13 - This print header can be changed using the printHeader HTML tag - see the viewONE HTML manual for further information)

Case 1:18-cv-00471-GLR   Document 2   Filed 02/15/18   Page 9 of 11

sharing interchange fees and/or rebates to its customers. Rebates to customers are normally based on a percentage of purchases or transactions, and the percentage often varies depending on whether purchases were made with the co-branding party or another entity. The institution benefits from a co-branding arrangement because it generally increases credit card receivables, and accordingly interest and interchange income, due to the consumers' willingness to use the credit card more frequently to reap the financial rewards. However, institutions typically face the risk that higher cardholder monthly payment rates could erode profits. Nevertheless, for some programs the considerable volume of interchange income generated by high cardholder transaction volumes might substantially offset the interest income opportunity that is lost with higher payment rates. [underline added] *March 2007 FDIC- Division of Supervision and Consumer Protection Pg. 12.*

17.   Testimony of *Edmund Mierzwinski,* Consumer Program Director U.S. PIRG, Before the

House Judiciary Committee Hearing on HR 2695, the Credit Card Fair Fee Act of 2009; 28 April

2010;

"For the past three years I have testified before this Committee and presented a simple message: the deceptive and anticompetitive practices of the two credit card associations – Visa and MasterCard – have injured both consumers and merchants for many years. That message still rings true. Interchange fees are hidden charges paid by all Americans, regardless of whether they use credit, debit, checks or cash. These fees impose the greatest hardship on the most vulnerable consumers – the millions of American consumers without credit cards or banking relationships. These consumers subsidize credit card usage by paying inflated prices for many goods and services. These prices are inflated by the billions of dollars of anticompetitive interchange fees, which are used to subsidize rewards programs, promotions, and riskier credit underwriting for credit card users." [underline added for emphasis] Note: *U.S. PIRG is an advocate for the public interest, working to win concrete results on real problems that affect millions of lives, and standing up for the public against powerful interests when they push the other way.*

## V. COUNT I
### (Declaratory Judgment)

18.   Plaintiff incorporates the allegations of paragraphs 1-19, as if fully set forth herein.

19.   Plaintiff seeks a declaration of his rights under MD Code Commercial Law - §13–301(1)

in accordance with the Maryland Declaratory Judgment Act, Courts and Judicial Proceedings

§3-401, et seq.

(Page 11 of 13 - This print header can be changed using the printHeader HTML tag - see the viewONE HTML manual for further information)

Case 1:18-cv-00471-GLR   Document 2   Filed 02/15/18   Page 10 of 11

20.    Defendants and Conspirators' ongoing scheme and continued misrepresentation as to

who pays the IF is inconsistent with the Maryland Constitution and the Maryland Declaration of

Rights. Defendants' current position is that the MasterCard credit card cardholder does not pay

the IF. Plaintiff's position is that the MasterCard credit card cardholder does pay the IF, and the

cardholder has no idea what that amount is on each MasterCard credit card transaction.

21.    There exists a case and controversy between Plaintiff and Defendants, which is ripe for

adjudication.

## PRAYER FOR RELIEF

A.    Declare, decree and adjudge that the Interchange Fee is paid by the MasterCard credit
card cardholder;

B.    Order any further relief as this Court deems just and proper to this cause.

D.    Award Plaintiff costs and attorney's fees.

## JURY TRIAL DEMAND

Plaintiff hereby requests a jury trial pursuant to §3-404. If Plaintiff was seeking damages

his claims would exceed $15,000.

(intentionally blank)

FILED

2017 SEP 25  P 12: 15

CLERK OF CIRCUIT COURT
HARFORD COUNTY, MD
CIVIL DEPT.

10

(Page 12 of 13 - This print header can be changed using the printHeader HTML tag - see the viewONE HTML manual for further information)

Case 1:18-cv-00471-GLR   Document 2   Filed 02/15/18   Page 11 of 11

## VERIFICATION

I solemnly affirm under penalty of perjury that the contents of the foregoing Complaint are true to the best of my knowledge, information and belief.

_Prescott Lovern, Sr._

Prescott Lovern, Sr.

Respectfully submitted on this 25th day of September, 2017.

Respectfully Submitted,

_Prescott Lovern, Sr._

Prescott Lovern, Sr. *pro se*
15 E. Churchville Rd, STE 150
Bel Air, MD 21014
Ph: (941)-870-8072
Fax: (941)-870-8091
corporate@rlassociateslaw.com

11